NOTICE
Decision filed 11/03/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 210164-U

NO. 5-21-0164

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* A.J., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Marion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19-JA-33 |
| | ) | |
| Steven J., | ) | Honorable |
| | ) | Ericka A. Sanders, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court.
Justices Cates and Vaughan concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The judgment of the circuit court of Marion County that terminated the respondent's parental rights is affirmed because the circuit court's finding that the respondent was unfit for failure to make reasonable progress towards the goal of the child returning home within the relevant nine-month periods is not against the manifest weight of the evidence.

¶ 2     The respondent, Steven J., appeals the May 24, 2021, judgment of the circuit court of Marion County that found him unfit as a parent, and found it in the best interest of the respondent's biological minor child, A.J., to terminate the respondent's parental rights. The respondent raises one issue on appeal, and that is whether the State met its burden to prove that the respondent is unfit. For the following reasons, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4     This case began with the filing, on February 26, 2019, of, *inter alia*, a petition for adjudication of wardship, following the removal of A.J., who was born in mid-May of 2018, from the care of the respondent and A.J.'s biological mother, due to allegations of neglect due to an unsafe environment. The petition alleged that A.J.'s environment was injurious to his welfare because A.J.'s siblings were removed by the Department of Children and Family Services (DCFS), and A.J.'s mother and the respondent had not fully corrected the conditions that led to the removal of A.J.'s siblings. In addition, the petition alleged that A.J.'s mother allowed the respondent to be in the home and in contact with A.J. in violation of a DCFS safety plan that had been in effect. The petition further alleged that the respondent consistently used and abused controlled substances and tested positive for amphetamines on November 21, 2018, January 4, 2019, and February 3, 2019, which made him unable, at times, to safely care for A.J.

¶ 5     On that date, a shelter care hearing was held in which the respondent's probation officer testified regarding the truth of DCFS's allegations that the respondent had tested positive for amphetamines on the dates alleged. In addition, the probation officer testified that the respondent had been administered a drug test on the date of the hearing, in which he was also positive for amphetamines and methamphetamine.

¶ 6     A caseworker from Caritas Family Solutions, which is an organization that contracts with DCFS to assist with the implementation of service plans for families, testified that A.J. is a sibling of eight other children who are not fathered by the respondent, six of whom were part of an open case with DCFS and had been removed from the home in 2015. When A.J. was born, four of the children had been placed back in the care of A.J.'s mother, although still under DCFS supervision. On February 3, 2019, the respondent was arrested for driving without a license and

was taken to jail, where he was charged with diluting a drug test. This presented a safety concern due to the respondent's substance use, and so DCFS initiated a verbal safety plan with the mother that the respondent could not be in the home or around the children until the respondent completed a substance abuse assessment. The mother agreed, but the very next day, one of the children went to school and informed personnel there that the respondent was back in the home. DCFS then pulled the four other children from the home and called the DCFS hotline to initiate a complaint regarding A.J. The circuit court entered an order allowing DCFS temporary custody of A.J. and his removal into shelter care.

¶ 7 On April 29, 2019, DCFS filed an integrated assessment and family services plan (service plan) which included recommendations to address the safety concerns that led to A.J.'s being removed from the home. As a result of this assessment, the action steps the service plan required of the respondent were as follows: (1) refrain from criminal activity, (2) successfully complete substance abuse counseling and demonstrate sobriety by submitting to random drug and alcohol testing, (3) participate in and successfully complete parenting classes, (4) successfully complete mental health services, (5) attend couples counseling with A.J.'s mother, (6) maintain stable and legal income, (7) maintain safe and stable housing, and (8) participate in supervised visitation with A.J.

¶ 8 On July 31, 2019, the circuit court held an adjudicatory hearing. After hearing further testimony surrounding the events preceding A.J.'s placement into DCFS care, the circuit court entered an order adjudicating A.J. as a neglected minor. The circuit court admonished the respondent, as well as A.J.'s mother, that they must cooperate with DCFS, comply with the terms of the service plan, and correct the conditions that required A.J. to be in shelter care, or they would risk termination of their parental rights.

3

¶ 9     The circuit court held a dispositional hearing on September 4, 2019. At that time, the respondent was being held in the Marion County jail and was transported to the hearing.[1] The circuit court entered a dispositional order making A.J. a ward of the court. A permanency hearing was set for December 16, 2019, and following that hearing, the permanency goal was set at "return home within 12 months." Permanency hearings were then continued for several months. On June 11, 2020, the State filed a petition for termination of parental rights and for appointment of a guardian with the power to consent to the adoption of A.J. The petition alleged that the respondent is unfit based on the following: (1) failure to protect A.J. from conditions within his environment that are injurious to his welfare, (2) failure to make reasonable efforts to correct the conditions that were the basis for the removal of A.J. during any nine-month period following the adjudication of neglect, and (3) failure to make reasonable progress toward the return of A.J. during any nine-month period following the adjudication of neglect. On August 17, 2020, the State filed an amended petition for termination of parental rights, specifying that the relevant nine-month periods for the respondent's failure to make reasonable efforts and/or progress were between August 1, 2019, and May 1, 2020, and/or November 10, 2019, to August 10, 2020.

¶ 10    Following a hearing on August 27, 2020, the circuit court entered an order changing the permanency goal to "substitute care pending court determination on termination of parental rights." The following day, the mother signed a final and irrevocable consent to the adoption of A.J. by her foster parents. Thereafter, there were numerous continuances of the proceedings due to the respondent's incarceration and the COVID-19 pandemic. The case finally proceeded to a fitness hearing on March 15, 2021, where the following evidence was submitted.

---

[1]The respondent was incarcerated for the remainder of these proceedings.

¶ 11    Kelsey King of Caritas Family Solutions was the first to testify on behalf of the State. She testified as to the basis for A.J.'s removal from the home, which was outlined in previous testimony at the shelter care hearing. Ms. King then testified about the respondent's initial service plan, which was admitted into evidence. As previously discussed, the service plan recommended that the respondent engage in the following services to correct the conditions that led to A.J.'s removal: (1) substance abuse assessment with random drug testing, (2) mental health counseling, (3) parenting classes, (4) stable housing, (5) safe environment, (6) legal income, (7) couples counseling, and (8) visitation. The respondent engaged in substance abuse and mental health counseling right away. As of July 30, 2019, the respondent was rated unsatisfactory on his drug testing because he tested positive for his probation officer on February 26, 2019, and July 9, 2019. The circuit court took judicial notice that the respondent was then incarcerated due to a violation of his probation for residential burglary. The respondent was also rated unsatisfactory in his service goal of remaining free of criminal activity due to his incurring further criminal charges.

¶ 12    Although the respondent was rated satisfactory for having completed his substance abuse assessment, he was rated unsatisfactory for mental health counseling because he was not participating in counseling regularly. He was rated unsatisfactory for parenting classes because he was on a waiting list with Project 12 Ways. He was rated unsatisfactory for demonstrating proper care and supervision during visitation with A.J. because he failed to provide healthy snacks or appropriate discipline. Although he was initially satisfactory for stable employment, he was later deemed to be unsatisfactory because his claimed employer reported that he had not been employed since June of 2019. He was rated unsatisfactory for stable housing because his home had broken windows and a beam had fallen in the basement. Overall, Ms. King rated the

5

respondent unsatisfactory on his service plan during the period from February 2019 to August 2019.

¶ 13    Ms. King testified that a third service plan was completed for the respondent in February 2020, reporting the progress he made during the period from August 2019 until February 2020. The respondent did not participate in any services during that period, although he was on a wait list for those services in the Illinois Department of Corrections (IDOC). The same goals and reports were made for the period from February 2020 until August 2020 and from August 2020 to February 2021. Overall, the respondent was rated unsatisfactory on these service plans. On cross-examination, Ms. King acknowledged that the respondent did rate satisfactory on some of his prior service plans involving the mother's other children before A.J. was born. In addition, Ms. King agreed that because the respondent had been incarcerated during both relevant nine-month periods, he had been unable to engage in the services set forth in his service plan. Ms. King testified that the respondent's anticipated release date from IDOC is April 4, 2022.

¶ 14    Andrea Davis testified she is a felony probation officer for Marion County. She testified that the respondent was on probation for residential burglary, for which he was charged in 2017. In reviewing probation records, Ms. Davis testified consistently with the probation officer at the shelter care hearing that the respondent tested positive for amphetamines in November 2018, January 2019, and July 2019, and amphetamines and methamphetamine in August 2019. On cross-examination Ms. Davis testified that records showed that the respondent was doing well on his probation until November of 2018. Following Ms. Davis's testimony, the State rested.

¶ 15    Alisa Brashear testified for the respondent that she is employed at Robinson Correctional Center as a correctional counselor. She came to know the respondent when he entered the transitional program there in April 2020. This is a cognitive behavioral program, including drug

6

and alcohol education. Ms. Brashear testified that she was the respondent's personal counselor until July 2020, when she left to work on another unit. However, the program was shut down some time before that due to COVID-19 related lockdowns at the prison. She testified that she remembered the respondent had been acknowledging his addiction and was actively participating in all the groups prior to the lockdown. Finally, Ms. Brashear testified that all the programs remained shut down from that time due to COVID-19.

¶ 16    Mickey Walton, another correctional counselor at Robinson Correctional Center, testified that he is the head of the "Inside Out Dads" program. He was part of the transitional program as well "until COVID." He testified that the respondent engaged in the transitional program, as well as Alcoholics Anonymous groups, and was then on the waiting list for Inside Out Dads. The respondent was set to begin that program in April 2021. In addition, the respondent was on the wait list for "Thinking for a Change," a behavior modification program that teaches social skills and how to handle conflict resolution. The respondent introduced documentation into evidence showing that he is also on the waiting list for "New Direction," a curriculum to provide substance abuse education to offenders with moderate need, and "Lifestyle Redirection," which focuses on criminal relapse prevention by emphasizing actions and consequences as they related to empathy, self-esteem, boundaries, anger, relationships, and trauma. The documentation also showed that the respondent completed "Adult Basic Education" and was then enrolled in "Advanced Adult Basic Education."

¶ 17    Following the presentation of evidence and argument, the circuit court found the respondent unfit for failing to make reasonable progress toward the return of A.J. during the period of August 1, 2019, to May 1, 2020, and November 10, 2019, to August 10, 2020. The circuit court then set the cause for a best interest hearing. Following the best interest hearing on

7

May 24, 2021, the circuit court found that it is in A.J.'s best interest that the respondent's parental rights be terminated. The circuit court entered an order terminating the respondent's parental rights and appointing a guardian with the power to consent to A.J.'s adoption by his foster parents. On June 8, 2021, the respondent filed a notice of appeal.

¶ 18                                    II. ANALYSIS

¶ 19    Termination of parental rights proceedings are governed by the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act, which delineates a two-step process to terminate parental rights involuntarily. 705 ILCS 405/2-29(2) (West 2020). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). 705 ILCS 405/2-29(2), (4) (West 2020); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the court finds that the parent is unfit, the matter proceeds to a second hearing, at which the State must prove that termination of parental rights is in the best interests of the child. 705 ILCS 405/2-29(2) (West 2020); *D.T.*, 212 Ill. 2d at 352. Here, the respondent only challenges the circuit court's finding of unfitness. He makes no argument challenging the circuit court's finding at the best interest hearing. Accordingly, we turn to the circuit court's finding that the respondent was unfit.

¶ 20    Our courts have recognized that parental rights and responsibilities are of deep importance and should not be terminated lightly. *D.T.*, 212 Ill. 2d at 364. Thus, parental rights may be terminated only after a finding of unfitness that is supported by clear and convincing evidence. *Id.* A finding of parental unfitness will not be disturbed on appeal unless it is against

8

the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id.* The circuit court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). This court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Each case concerning parental fitness is unique and must be decided on the particular facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). In addition, because each of the statutory grounds of unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *In re C.W.*, 199 Ill. 2d 198, 217 (2002).

¶ 21    Section 1(D)(m) of the Adoption Act contains three separate grounds, any one of which may uphold a finding of unfitness. Subsection (i) deals with a parent's failure to make reasonable efforts to correct the conditions that were the basis for the removal of the child; subsection (ii) deals with a parent's failure to make reasonable progress toward the return of the child within nine months after an adjudication of abuse, neglect, or dependence; and subsection (iii) deals with a parent's failure to make reasonable progress toward the return of the child during any nine-month period after the initial nine-month period following the adjudication of the child as abused, neglected, or dependent. 750 ILCS 50/1(D)(m) (West 2020). Here, the circuit court found the respondent was unfit based on his failing to make reasonable progress toward the return of A.J. during the nine-month periods of August 1, 2019, to May 1, 2020, and November 10, 2019, to August 10, 2020, thus implicating subsection (iii).

¶ 22    Reasonable progress is judged by an objective standard based on the amount of progress measured from the conditions existing at the time custody was taken from the parent. *Daphnie*

9

*E.*, 368 Ill. App. 3d at 1067. At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification, and reasonable progress exists when the circuit court can conclude that it will be able to order the child returned to parental custody in the near future. *Id.* Here, the evidence supported a finding that the respondent did not make reasonable progress during the two nine-month periods indicated. The respondent was incarcerated the entirety of both nine-month periods, and thus had been unable to meet any of the objectives of his service plan, other than his Zoom visits with A.J. While the respondent urges this court to consider evidence that the respondent did make progress on his service plans with DCFS regarding the mother's other children, the circuit court was required to consider evidence occurring only during the relevant nine-month period mandated by section 1(D)(m). *In re J.L.*, 236 Ill. 2d 329, 343 (2010). It is unfortunate that services were unavailable to the respondent while incarcerated, and we are aware that services in our prisons were especially limited by the impact of the COVID-19 pandemic. However, our supreme court has clearly held that time spent incarcerated is included in the nine-month period during which reasonable progress must be made under section 1(D)(m)(iii), as the statute contains no exception for incarcerated parents. *Id.* Moreover, while we commend the respondent for his efforts to engage in services while in IDOC, reasonable efforts and reasonable progress are two different grounds for finding a parent unfit, and the respondent's subjective efforts based upon his circumstances are irrelevant to the analysis of his progress. See *Daphnie E.*, 368 Ill. App. 3d at 1067.

¶ 23 The testimony demonstrated that the respondent would have to be released from the IDOC before making further progress on his service plan, and many steps were required from the respondent before there could be a return of A.J. to him. Even if the respondent were able to engage in some services in IDOC, due to his substance abuse issues, he would have to

10

demonstrate an ability to stay sober once released, and to maintain stability, employment status, and housing. Thus, we find that the circuit court's finding that the respondent is unfit because he failed to make reasonable progress toward the return of A.J. in the nine-month periods alleged is not against the manifest weight of the evidence, and thus must be affirmed. Again, the respondent does not challenge the circuit court's finding that it was in A.J.'s best interests that his parental rights be terminated, and so it is also affirmed. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued are forfeited).

¶ 24                                    III. CONCLUSION

¶ 25    For the foregoing reasons, the May 24, 2021, judgment of the circuit court of Marion County, that terminated the respondent's parental rights as to A.J., is hereby affirmed.

¶ 26    Affirmed.